Good morning. Dan McCarthy for the appellants. I'd like to reserve if I may 5 minutes from applying. This case concerns the dismantling of a $130 million a year company. Six days after the bankruptcy was filed, the possession of the assets were turned over to a secured creditor under stipulated foreclosure. And then approximately 10 months later, the valuable claims belonging to the estate are sold off and claims are released that are also valuable based upon a declaration from the trustee with the motion that was filed for approval of a compromise that wasn't even a page long. There are a number of issues presented by this appeal which is taken from three orders. First order is an oral order of the bankruptcy court from April of 2002 which was never reduced to writing. Then there are two companion orders from February 27, 2003 and March 7, 2003 under which claims were sold and releases were given. The threshold issue was argued in the briefs regarding whether my clients have standing. I don't think that's a real issue before this court. All of my clients filed claims. None of those claims have been objected to. Under 11 U.S.C. Section 502A, they're deemed allowed, at least at this point in time, as a matter of law. Creditors clearly have the right to file an appeal from an order that affects a bankruptcy estate, and that's what these consolidated appeals concern. Now, with respect to the April 25th order, did your clients object to the entry of that order? There was no order that was submitted, Your Honor. The prevailing order was not. They were aware of what the court was doing, were they not? I'm sorry. Were they not aware of what the court was doing? Well, they were sure. Well, yes and no, Your Honor. Mr. Stern was present at the hearing in his individual capacity. He's one of, I think, what do we have, eight appellants before the court. So Mr. Stern was aware of what occurred at the hearing. The other parties were not aware of what occurred at the hearing, hadn't been noticed, and weren't represented. And one of the problems, and this goes to the due process issue, is that they weren't made aware of what was happening before the hearing. Keep in mind that the April 25th hearing occurred on three days' notice on the motion for relief from stay by CIT, and two days' notice on the motion for relief from stay by Eris Industries to terminate the license agreement. When, if at all, would the stay have terminated by operation of law? Would it not have terminated 30 days after the request for relief? Under 362e? Well, no, Your Honor. I mean, the motion would have had to have been granted for relief from stay to have been issued, and that was certainly opposed going into the hearing. Then there's this compromise reached at the hearing, and nobody's given notice of that and an opportunity to object. Well, would a stay not be automatically terminated 30 days after the request for relief under 362e unless somebody asked to do otherwise? No, Your Honor. No. The relief from stay is not automatic. The motion has to be filed to obtain that relief from stay. The hearing's supposed to occur within 30 days on full notice. Often that's treated as a preliminary hearing at the initial hearing, and then there's a final hearing on relief from stay generally within another 30 days. But parties are given an opportunity to object. Now, in this case, a settlement's reached at the hearing, and the settlement actually is contrary to the bankruptcy judge's tentative ruling, which was not to give CIT relief from the automatic stay, and it's a compromise of a relief from stay motion actually to relief from stay motions under Bankruptcy Rule 4001. Bankruptcy Rule 4001c1 requires such compromises to be noticed out to creditors, and it wasn't done here in violation of a rule. Now, Bankruptcy Code's rule – I'm sorry, Bankruptcy Rule 4000d4 allows a bankruptcy judge to dispense with the necessity of notice if he feels that sufficient notice has been given. Judge Robles made no findings in that regard, either at the hearing and certainly not in an order, because no written order was ever issued. Let me see if I understand. Now, there was notice of – there was one notice of the hearing given under Rule 2002, right? And then the – some parties appeared, or the compromise was – are you talking about the February 27th order now? No, I'm still focused on the April order. I'm sorry. I'm sorry. I'm getting ahead of you. All right. Yeah. The April order, minimum notice was given two or three days, depending on the motion. An agreement's reached at the hearing, it's recited for the record, never reduced to a written order. None of the other appellants, other than Mr. Stern, even had a chance to weigh in on that, and that order effectively dismantled the $130 million-a-year company by allowing heiress, but not heiress to subsidiaries, which is an interesting issue, to terminate the license agreement and allowing CIT to take possession of the collateral and foreclose. And no other creditor even had an opportunity to weigh in on that. We consider that to be a serious violation of constitutional due process rights to dismantle a company, and that's short a notice in a compromise that's not even informed of the creditors. Now, you have similar due process issues with respect to the orders of February 27th and March 7th, 2003, and that was fully noticed to creditors, Your Honor. The problem was, once the parties showed up at the hearing on February 26th, there was a settlement in the hallway. The parties that are settling with the trustee come back in and say, we're bifurcating the settlement. Judge Robla says, fine, I'm going to approve one part of the settlement by giving heiress, the heiress parties, their release, and I'm going to schedule a hearing in about a week if Mr. Stern deposits $250,000 within two days. Now, what do you think of that? Can I just stop you there? Who besides Puebla Trading was entitled to notice? Because am I not right in saying that only the largest 20 creditors were entitled to notice under Rule 107D, 1007D, and Puebla Trading was on that list, and it did get notice, and who else would have been entitled to it? Now, you're talking about the motion for relief from stay and enrollment. Yeah, which I think is what you're still talking about, right? Your Honor, I was moving on, but with respect to that particular motion, you're right, the 20 largest were required to get notice. And Puebla did get it, correct? You know, I don't recall. I think it did. Puebla got it. It was a very short list, which was unfortunately very short, because Mr. Stern. So who among the parties you represent was on that list that didn't get notice? I believe all of them. I didn't think Puebla was on the list. I know Mr. Stern was on the list. Nobody else. You say he was on the list of 20 largest creditors? He was present at the hearing. He was present at the hearing, but was he required to get notice? The creditors on the list of the 20 largest were required to get notice. And did they not? And the people on that list got notice. The problem was that the list was deficient because it couldn't be properly prepared. Well, whose fault is that? The allocation of faults is an interesting issue. Mr. Stern had been dispossessed of the control of the debtor approximately two and a half weeks before the bankruptcy was filed. One of the motions that was before the court on April 25th was a violation of stay motion because he was trying to get back into possession, and Judge Robles denied that. So Mr. Stern was not able to get the paperwork necessary to prepare a proper list of 20 creditors. So you're saying that the record would disclose that there were people who were among the 20 largest who weren't on the list? Oh, yes. Absolutely. But the list of 20 largest wasn't even a correct list of 20 largest, Your Honor. Well, that's what I'm trying to find out from you. You're saying that the list was incorrect? Correct. And who among your clients should have been on the list that wasn't? I need to look at the list of the largest creditors, Your Honor. I know that Mr. Stern, Eagle Apparel Group, and Sterne Holding each held claims in excess of $4 million. One of the trade appellants held a claim of $550,000. I'm not sure which one it is. I can tell you if I check the record. The other appellants would not have been on the list of 20 largest. So among your clients is Sterne, Sterne Holdings, and who else? Eagle Apparel? And Eagle Apparel. And then among the trade appellants, it would have been one of the trade appellants, I'm not sure which one, held a claim of $550,000. That was filed in March of 2003. And, Your Honor, the problem is not just who got the notice of the initial hearing. It was once a compromise was reached under 4001 of the Rules of Bankruptcy Procedure, a new notice should have been sent out regarding that compromise. To whom? To all creditors at that point. Under Rule 9019A of the Federal Rules of Bankruptcy Procedure, compromises are required to be noticed out. Rule 4001c1 requires that agreements regarding relief from stay be noticed out to all creditors. That wasn't done. And as I said earlier, Rule 4001d4 would have allowed the judge to dispense with that requirement, but he made no ruling in that regard on why no further hearing was required. He just didn't have a further hearing. And this was a very complicated settlement that went on for pages of the transcript. It should have been noticed out to creditors. When? When was the compromise reached? So when should this notice have been sent? Oh. Well, the compromise is reached at the hearing. The Court's informed of it. Which hearing? On April 25, 2002. And then a notice of hearing should have gone out on approval of that compromise so that all creditors had a chance to object. Nobody was told about that compromise except for the people that were at the hearing, and it was approved that day. Well, but I thought that your client was participating in subsequent hearings. My clients did participate in subsequent hearings. You're right. So I guess I'm just not understanding why this claimed lack of notice to that earlier order or whatever it was caused so much trouble for you. What it did was it dismantled the company to the detriment of the creditors. The compromise that was reached on April 25, 2002, allowed CIT, the secured creditor, to take possession and foreclose, and it allowed AERS Industries to terminate the valuable license rights that belonged to the company. That hurt the creditor group by taking away the company that could have paid them. But which of your clients didn't participate in what happened on April 25? Stern was there, right? Stern was there. In fact, he agreed to it. Did he not? I mean, he did. He thought this was a good deal. Didn't he? Didn't he say that it was basically worthless? I'll put it this way, Your Honor. He agreed to it at the hearing. Under the pressure of the hearing, he agreed to it. But the problem was none of the other creditors did. Well, ones you represent? He was represented, yes. No, no, no. Your clients. I'm sorry. Yeah, I guess I'm just saying the same thing. Mr. Stern was not individually represented. He was represented as an officer of the debtor. Technical distinction. But he was there in a corporate capacity on behalf of the debtor. And so had knowledge. Who had knowledge of what was going on, right. And he agreed to it. Which of your clients – you're saying Stern individually should somehow be considered harmed because even though he was there and agreed to it, somehow he's been harmed. Who else among your clients was harmed by not being there? All the rest of them. Because the debtor, $130 million-a-year company, was dismantled as a result of that hearing. And none of the other clients, none of the other appellants had an opportunity to object to that. They weren't even told about it. And the same due process – Well, didn't they have an opportunity – I thought that there was a – that you requested emergency relief and you asked for an injunctive relief and all this stuff later. There was an adversary proceeding subsequently filed by Mr. Stern individually on behalf of the company in June 2002. Four days later, a trustee was appointed and had the authority to proceed with that adversary proceeding, which was trying to recover assets for the estate. Mr. Stern no longer could control that proceeding. Now, the next hearing that occurred, which is subject to the appeal, is the one that occurred on February 26, 2003, regarding this two-part compromise motion that was totally unsupported by the evidence. Again, after a discussion in the hallway, the settling parties, not Mr. Stern, they come in and they tell the judge how they want to bifurcate the settlement. The judge approves part of the settlement right then and there without giving any chance to overbid on this, what he called, new contract that's been created. The other new contract that was created, he gave Mr. Stern two days to come up with $250,000, and when he didn't, he approved the remainder of the settlement without any notice to the other creditors. But it was a better settlement than the original conception, was it not? The original motion was noticed out. The bifurcated motion, which created two new contracts, was not noticed out. But the amount of money being paid went up? The amount of money being paid was $250,000 and $150,000. So it ended up being $400,000. So it went up? Right. So this is a better deal? Yes, but if other parties had had an opportunity. Well, the first problem was there wasn't evidentiary support for even that being appropriate. There was no opportunity for overbid to see whether the market would have allowed it to be even more. And when the contracts now were two new contracts were created, that wasn't noticed out to creditors to give creditors a chance to say, you know what? I want to bid on part of that. This element, which was all stuck in one agreement, now is bifurcated out. And perhaps a creditor would have come in and bid for it. Well, let me ask you this. I understand you made arguments why the first proposal of $250,000 wasn't adequately noticed, okay? You may be right about that. But assuming that you're not, just for the sake of discussion, if everything was correct with regard to that, then how could there have been a problem when the court accepted a better deal? Because it could have been better than that. But if the first one was properly noticed, you see, I'm assuming that. Oh, Your Honor, the first proposal that was noticed, assuming it was properly noticed, was objected to by my clients. They said that the $250,000 was not proper. $400,000 wasn't enough. But I thought he agreed to that on behalf of the company. No, no, no. At that note, that hearing was entirely adversarial. There was no agreement to what occurred at the hearing in February. He agreed to the $250,000, didn't he, sir? No, he didn't. He didn't. No, he wanted to overbid, and he asked for a full opportunity to do that on a fully noticed motion where other creditors would be entitled to overbid. And the court denied that. It said, come up with $250,000 in two days, and then I'll let you get involved in the bidding. The other creditors weren't given that notice. It certainly wasn't full notice, and it should have been. But when you say other creditors, are you trying to – are you confining yourself to your clients? Well, all creditors should have received notice. But, yes, I'm speaking on behalf of my clients. There should have been full notice, an opportunity to be heard on this new bifurcated contract which was recited at the hearing. Do I understand you correctly that you are arguing that if there had been full notice that somebody may have come in and provided more assets that would have helped your client be better off? Is that what you're arguing? Your Honor, that's absolutely the case. Okay. One of the objections is raised that the trade appellants never showed that they were willing and able to pay more money. Well, the problem was they weren't given an opportunity to do that. There wasn't notice to them. Well, in all of these proceedings that have gone on since, has there been any showing of how – of who would have come in and done what if they had had notice of that first proceeding? No, Your Honor. There's certainly no opportunity to do that, to say, had you complied with due process bankruptcy court, here's what could have happened. It sort of puts it backwards. The due process should be complied with first. There should be a full opportunity to be heard, and parties should have an opportunity to come in and object and bid. Okay. The due process violation, then, is with respect to that April agreement? All three orders that we're appealing from are subject to the due process. The April 2002 agreed order, which was never reduced to writing, was agreed at the hearing, but never noticed out to creditors. In February 2003, 10 months later, a compromise motion asked for approval of a settlement agreement, which is divided up into two parts. One's approved right then and there without any opportunity to overbid, now that it's been pulled out of the contract, without any notice to any creditors that this is being done, and the other part is then approved a week later. But you see, what's troubling me is that it's being done, apparently, at least much of this, with the acquiescence of those who are there. And bankruptcies have to move along. I mean, you can't just say, well, are we to write an opinion and say that nobody is to agree to anything, nothing is to be done until we've gone through exhaustively and made sure that every possible person has received notice of this, because that just can't be right. Well, one of the ways to look at the answer to that question is what was the urgency of getting things done that day or within a week? There wasn't any urgency whatsoever. And due process requires, in light of there not being an urgency, an opportunity to be heard. Okay. What is the strongest authority here that you're relying on with respect to the breadth of notice of what appears to be an agreement that is reached within the Court? Your Honor, our brief discusses the six or seven pages of discussion of Ninth Circuit decisions regarding the City of New York. No, but I'm asking you, what do you think, what would you point us to? If it's due process, then there must be something that really tells us that this is a matter of fundamental fairness. Well, the Center Wholesale case, for example, where there was one-day notice that was given, creditor's rights were affected. The Court on Appeal found that that one-day's notice wasn't sufficient. Here, there was no notice of what happened on April 25th when an agreement's reached. That's not noticed out to creditors. On February 26, 2003, there's no notice that this is, this contract has now been bifurcated. Half the contract gets approved that day without any further opportunity for parties to object, and a week later, the rest of the bifurcated contract gets approved, again, without full notice to the creditors. So there's no notice at all. At least in Center Wholesale, there was one-day's notice. You have to give creditors an opportunity to know what's going on and express their objection. Creditors weren't given that. What did the BAP do with respect to this contention? Well, the BAP, in my opinion, danced around the issue of due process. On April 25th, the BAP basically said, well, Mr. Stern agreed, and it was approved. What about all the other appellants? On the orders that were entered on February 27, 2003, and March 7, 2003, the BAP made two fundamental mistakes of fact in reaching its opinion. One, the BAP said, Mr. Stern had advocated the abandonment of the claims. How can he then claim later on that those claims had a lot of value? The reason that was a mistake by the BAP was because Mr. Stern advocated the abandonment of claims only against CIT and Eris, not the abandonment of any claims that the estate might have against him that were later sold. That was one part of the Court's mistake on the abandonment. The other part of the Court's mistake was Mr. Stern had advocated abandonment of these claims several months before because the estate didn't have the money to pursue them, not because they were valueless. And the bankruptcy appellate panel thought that that abandonment meant somehow Mr. Stern was consenting to the fact that they were valueless. Maybe I didn't follow you there. You said the BAP was wrong because they said that Mr. Stern didn't advocate abandonment of the claims. And yet you said that he did advocate abandonment of the CIT and the Eris claims. And doesn't the estate still have the right to pursue Stern? I mean, isn't it really part of the concern here they now have the money to pursue Stern? No, Your Honor. The claims against Mr. Stern and related parties were sold to Arnold Simon under the settlement that was approved. Under what? Under the order entered March 7, 2007. March 7. And you have to keep in mind that there were three groups of rights that we're talking about, rights against CIT, against Eris, and against Mr. Stern. When Mr. Stern supported abandonment in late 2002, he only supported abandonment of claims against CIT and Eris. So the bankruptcy court was mistaken in saying that he was supporting abandonment of all claims. The more fundamental mistake by the bankruptcy appellate panel was that it interpreted the support for abandonment as a concession that those claims were valueless. And the papers that Mr. Stern filed expressly stated otherwise. He stated that they had value, but the trustee didn't have money to pursue them. Right. So that's why his support of the trustee's abandonment of the claims was not a concession of lack of value, as the BAP concluded. The BAP's other fundamental mistake was in implying that Mr. Stern's failure to prosecute the adversary proceeding that Your Honor had asked about that was filed in June 2002 was a tacit admission that the claims that existed against CIT and the Eris parties were valueless. Counsel, you've more than used your time. Thank you. We'll give you a minute to sum up and rebuttal. Okay. Thank you. May it please the Court. Good morning, I believe, still. Craig Rankin, representing Eris Industries, Inc., Adamson Apparel, Inc., and Arnold Simon. The, Your Honors, the, here's, let me summarize the facts really briefly, because I, a little bit of a jumble about what happened. There was a, my client, Eris Industries, licensed trademarks to Grupo Extra. It tried to terminate those licenses lawfully. An action was filed, an action was filed in New York. A superior court in New York issued a temporary injunction preventing the termination of those licenses. And there's some question as to when the order was entered, but on the same day that the New York superior court said, I want to, I want to dissolve that injunction and allow the termination of the licenses, Grupo Extra filed a Chapter 11 bankruptcy  And Mr. Stern was the responsible individual in that case. In less than a week, based on allegations of fraud and defalcation committed by Mr. Stern as the president of Grupo Extra, CIT moved for relief from stay to take control of the collateral. And my client, Eris, moved to terminate those licenses. And as this Court is aware, under its decision in Catapult, ironically, this debtor who operated solely with the use of the license to use the trademarks could never successfully exit a bankruptcy case because it couldn't assume that license agreement under the Catapult decision of the circuit. At best, it had, under its agreement with Eris, six months to liquidate the collateral that was licensed collateral. It was a runoff right, a sell-off right. That's all that remained of this company before it was going to have to be liquidated under Ninth Circuit law that wouldn't allow a restructuring and assumption of that license. Now, we get to the hearing within a week of the bankruptcy case being filed. And you have Eris saying this trademark should be terminated. You have these violations. You have CIT saying we want relief to stay to foreclose on all of our collateral because of these frauds committed by Mr. Stern. The debtor's there through Mr. Stern, and Mr. Stern is there personally because he's pledged some personal collateral to support the CIT debt. At that hearing, notice went out to every single creditor that was known to Eris and CIT. Every creditor that was listed by Grupo Extra, that is, that CIT or Arnie Simon knew of, received notice of this emergency hearing. And as Your Honor stated, bankruptcy is a fluid process. These were emergency hearings, and bankruptcy courts have full jurisdiction to deem whatever notice is given on an emergency basis appropriate. So you had all the players in the courtroom. Over many hours, an agreement is reached. Mr. Stern says, CIT, you can foreclose on the collateral. Eris says, I'll tell you what, you consent to the termination of our trademark. We need to go back and revive the value of our trademark by getting back in the business of manufacturing goods under our trademark because you screwed that up. So they agree to buy back the goods that exist, and maximum value of the assets is going to be obtained now because now you're going to have a lawful exercise going on in business through Adams & Apparel. That's why they're a party. They bought the goods from Grupo Extra, and they got a license from Eris, and CIT agreed to transfer loans to this new entity. And this all happened, was read into the record. It had to happen immediately because the only way that CIT and Eris were willing to make this agreement, which included a release to Mr. Stern of $500,000 of side collateral, a little personal benefit for Mr. Stern, was if this all happened immediately. So this is all read into the record. And Judge Robles says, you know, there may never be a written order for this because I understand my action needs to be taken on this order right now. Does everybody agree? He said that in the record. He said that in the record. That's in the briefs, quoted in the briefs. And so there was no expectation of a further written order. So in the next day, this is done. That is, the transaction is consummated. Then Mr. Stern, on behalf of the debtor in possession, who, by the way, if there was going to be any further notice, was the one who should have given the notice because he's still the debtor in possession. There's no trustee yet. We weren't the ones to do this. So about two months later, or a month later, rather, he hires another lawyer. And that lawyer says, what did you do that for? And he files the action, seeking the temporary injunction that Your Honor mentioned, saying, wait a minute, let's undo what the judge just did a month ago. There was a lot of collateral that CIT is going to get here that we're never going to realize on. And the judge denied the temporary restraining order request. Now a month later, a Chapter 7 trustee is appointed. For the first time, the Chapter 7 trustee steps into the shoes as fiduciary for the estate. Now what happens? About two months later, I get hired. And this is the circumstance. You have no operations. You have a Chapter 7 case where the only assets are litigation assets. Litigation assets, the right to litigate against Mr. Stern and entities and people that he's wrongfully transferred assets of the debtor to. You have theoretically the right to litigate against heiress, although I can't imagine what the right would be, since it's just a licensor of a trademark and was just simply due monies. And even if you could revive the license, which by now, by the way, has been completely sold, there's no value in doing so because you can't assume it under catapult. Maybe there's claims against CIT for extra value of collateral. Those are in the ether. For six months, there's negotiations. The Chapter 7 trustee did a fantastic job in this case to get two sides who hated each other. You have CIT and heiress on the one hand and Mr. Simon on the one hand. You have Mr. Stern on the other hand and his entity. Well, that part is evident. So what the trustee does, which was clever and very strong arm, but it was appropriate, I believe, was say, you know what? If you guys aren't going to give me money to fight against each other, then I'm going to abandon all this crud because we don't have any money. And I don't know how to get value for this other than just sitting here sticking my feet in the mire. So he notices up an abandonment and he convinces our clients, heiress, CIT and Arnie, to agree to put up 250 grand of solid cash. He also gets us to agree to release any rights we have in distribution to that cash so that wherever that money goes, we don't touch it. That's consideration for the abandonment of his? That's consideration for release of heiress, for release of CIT. And it no longer is abandonment. He withdraws the abandonment motion and instead notices up a relatively complex compromise motion pursuant to which 250 grand of cash is going to come into the estate. CIT and heiress are going to waive rights to share into that. And most importantly, Mr. Simon personally says, I'm going to put my own money into investigating the claims against Mr. Stern and his entities. I'm going to go pursue those claims. And I'm going to give the estate 5% of the gross I recover, if anything. Now, that was what was noticed. So now we get to the hearing. This is the first hearing is on February 26th. And we're there. And at that hearing, counsel for Mr. Stern advocates strongly. He says, look, I want to buy claims against heiress and CIT. And I don't want Mr. Simon to pursue claims against Mr. Stern and his entities. I'll bid more. Now, the trustee says, look, I've noticed a compromise motion. I've been negotiating with you for six months. You never put anything hard on the table, so enough with you. You haven't shown yourself to be an honest bidder. I'm done. This is the deal. It's a compromise. I want it to be approved as a compromise. Mickey Thompson says, when you're giving releases back and forth, it's not a sale, it's a compromise. But Judge Roble says, you know what, I want to give Mr. Stern a chance, because money from the devil is still money. He says, I'm going to give this guy a chance, whether you like it or not, this side of the table, to offer an alternative compromise. Now, he couldn't bid on the sale, understand, because we're, heiress and CIT are getting a release and putting up cash, and they're pursuing the Stern entities. Certainly Stern is not going to pursue himself, so he would have to offer an alternative compromise by which he would agree to pursue CIT and heiress and get a release for the Stern entities, which might have dramatically different value. In fact, they do. So I'm his counsel for heiress. I decide, why is heiress here? Why is heiress paying value at all? Because its trademarks are suffering by this dirty cloud of this trademark having been And you make disclosures. This is a ten-page disclosure. And it's really hard to understand if you're lawyer for one of the parties, let alone somebody just trying to license a trademark. So we negotiate with the trustee. We say, look, when you look at the pleadings, the only argument Stern has, the only argument he has, is that CIT has extra collateral there that they're getting for free when they get released as part of this global compromise. Now, importantly, Your Honor, CIT has settled out, so they're not here. So that issue is gone. There's no mention that there's any claims against heiress, because there aren't any claims against heiress. It's just a licensor that sold money. That's all there is. So I say, look, trustee, what's it going to take to get unbogged down by this mess? Because my client wants to sell, relicense its trademarks, and move on. So the trustee says, 150. And we decide, you know what, legal counsel, I get paid to explain to corporate counsel what's going on. Corporate counsel has to explain to the licensee for the next vandal line. Long story short, we agree to pay 150. And the trustee comes in and he says, great news, judge. This is what I've got worked out. We're going to let Mr. Stern bid. If he really wants to bid, we're going to let him bid. And we're going to have a chance to bid. We're going to figure out what that bidding is if he decides to pony up money and really bid. But we just got 150 for just the release of heiress, just a little tiny micro piece of this overall settlement deal, which the estate values at zero, these claims, other than holdup leverage. So we got 150 grand of extra cash, phenomenal result for the estate. And he also got, which was not that easy to get, my client and CIT to agree to pay and give Mr. Stern a chance to bid against it. Now, counsel for Mr. Stern says, we sure want to bid against that. We sure do want to bid. So the trustee didn't say and the court didn't say, put 250 down that you don't have. The court said, instead of the schedule, when can you put your 250 up? I want it up now, I want it next, but I didn't schedule. So the court gives him two days to put $250,000 into the trustee's account as a prerequisite to having a continued hearing the next week to have a bidding. So what does Mr. Stern do? This is dispositive of the appeal, in my mind, before we get to mootness. He doesn't send the 250. Instead of saying, thanks, Your Honor, for this extra piece of due process that's not required. Thanks a lot. Here's the 250. I'm going to show up and make a creative bid. He sends 250 grand cash to his counsel. So he takes some money from this pocket and he moves it into this pocket. And then he sends a letter to the trustee saying, I don't know what the court did, I know what schedule the court set, but I don't have any respect for any of that. I'm going to make my own bid. Here's my bid. I'm not going to give you any non-refundable deposit money. I'm holding the money in my pocket. The trustee quite rightly decides he's going to put at risk the 250 deal he has with Aris and CIT if he doesn't comply with the court's order, plus the court has an order on file. So he has a declaration that says, nobody sent me the 250. Please approve the overall second part of the deal. So the second part of the deal gets approved. Now, that's what happened. Now we go to the BAP. Right away, he seeks a staypending appeal, Stern does. Very smart move, because it's going to be moved pretty quickly if we sell the trademarks. So he gets the stay, and the BAP grants it, not because of the merits, because the BAP understood, if we don't grant the staypending appeal, there's nothing to deal with here. It's going to be moved overnight, like a lot of bankruptcy cases are. So they grant the stay, and we have our oral argument right here in this same courtroom, and we win. And when you read that decision, they got it right on every single issue. We went backwards. We said, if you approve the releases to CIT and you approve the releases to CIT, you have to even deal with that first order, because it's moot, because all the releases have been given. And the Court quite rightly said, the Court gave extra due process at the trial level by giving Stern a chance to bid and putting, setting forth procedures that were quite easy to accomplish because he had the 250, but instead of setting it to where the Court said, he sent it, he just made up his own rules and sent it to his lawyer and said, well, let's do this instead of what the Court said. That's not the way it works. But he had his stay. The BAP ruled, and then what did he do? And this would be what I'd first say if everything, if this was a simple case, but it's complex. This is what I believe is dispositive. And in their reply brief, they talk about this. This case is moot. I mean, interesting legal points. Due process was obtained. When you get here on a bankruptcy issue and you're a bankruptcy lawyer like I am, you want to deal with the legal issues, but most of the time, by the time you get here, it's moot. And that's true here because Stern abandoned the stay. He had to seek a stay. He never asked his Court for a stay. He had a stay through the BAP's opinion, and instead of seeking a stay, and he had $450,000 on hand to protect that stay, he wanted that money. So he let the stay evaporate and went after that money. When the stay evaporated in December of 2003, after the BAP's opinion was issued, we sold the trademarks. Now the trademarks that Eris owned are owned by a third party unrelated to Eris. Now Mr. Simon, who bought the right to pursue the Stern entities, has incurred substantial expense in pursuing the Stern entities. So Stern's playing defense on that litigation. Now the trustee, now that there's no stay, has gone forward to administer the bankruptcy case, has gotten approval of expenses and paid those out to third parties. That is, we've all acted as we would after an order's entered. We haven't waited to see if this appeal's going to be successful, so now it's materially moot. There's no bell we can unring. It's impossible with respect to the trademarks. You'd have to get them from a third party who spent tens of millions of dollars developing and exploiting these XOXO and BabyFat brands, which I'm not a big fan of, but a lot of people are. So money's been spent on that, and large businesses unrelated to Mr. Simon are making lots of money and have spent lots of money on those trademarks. So that bell's unringable. So once you get back to that, you have to say what damages could the estate get against Mr. Simon or Eris, and here's what's great. Here's the trustee. The trustee's counsel is not over here on this side of the table. The trustee's counsel on our side of the table. So, I mean, I'm going to let the trustee speak, but that's a very important factor here. And let's take one of those questions. Thank you. Larry Simons of Solmeyer Cupitz for Jeffrey Golden, Chapter 7, Trustee. Picking up a little bit where Mr. Rankin left off, with the — in regards to the mootness argument, and let me back up just a moment. The important thing to notice is that, unlike the appellant here, the trustee in the Chapter 7 bankruptcy has a fiduciary duty to represent the bankruptcy estate and all the creditors. And I use creditors as a little c, meaning that the trustee wants to maximize the return to everybody in the estate. The appellant is just concerned about his well-being and his clients. As Mr. Rankin had mentioned, with regards to the mootness, there's three things that have transpired since this appeal came to the Ninth Circuit. The first is the trustee has disbursed monies to his professionals, which are third parties and not parties to this appeal. Second, the trademarks have been sold to a third party, and as Mr. Rankin discussed, they have been utilized and put back in the stream of commerce, and several millions of dollars have been generated by that. Lastly, or two-part, the other thing the trustee did is he dismissed with prejudice the pending lawsuit that Mr. Stern had filed prior to the trustee being appointed. That was required by the settlement agreement that was entered into, and the trustee took affirmative acts to dismiss that lawsuit with prejudice. And the final thing is that Mr. Simon and the heiress parties have been prosecuting the actions against Stern since this has been pending with the Ninth Circuit. They have taken those actions. If this was to be undone and the money was returned, the trustee would then have an estate that had no monies in it and would have to fund the litigation without any hope of recovery or very little hope of recovery. What the trustee was able to accomplish by taking a 5 percent holdback, if you will, is that somebody else is taking the risk, and that the trustee, if there's any monies to be found, will get additional monies, meaning that the compromise that was noticed to all the creditors and sent out not only provided for the payment of $250,000, not only provided for the release and subordination from Eris and CIT, it also allowed the trustee to retain a 5 percent interest in any monies that came in. What do you want us to do? Dismiss the whole appeal as moved? Well, I believe at this point that, yes, the parties have taken substantial change in positions since the BAP entered its decision in December 2003, and that this appeal is moved and should be dismissed. If this Court's not inclined to do that. The BAP decision was never stayed? Correct. Once the BAP entered its decision on December 2003, Mr. Stern and the appellants never sought a stay. And so the State had never sought a stay, and certainly they knew how to do so. They did so at the BAP level. If this Court is not inclined to dismiss this case as being moot, Trustee asserts that the February 27th and March 7th orders resulted from a compromise. Simply put, looking at the holding in Mickey Thompson, releases were given to CIT, releases were given to the Eris parties. And not only that, as I mentioned, both those entities agreed to subordinate and not share in the distribution of these monies. Now, that notice that was sent out, was sent to all the creditors, was properly noticed at that time. And what Mr. Stern, the two points that Mr. Stern's parties or Mr. Stern's counsel does not really discuss is that there really were no other parties that Eris, CIT, or the trustee expected to come in and bid on these causes of action. Meaning throughout this whole proceeding, it was Stern, Eris, and CIT. When they complained that the trade creditors may have come forward and bid, they received notice. They're not arguing that they didn't receive notice of the compromise motion. They were on the service list. If they were truly interested, they could have shown up at the hearing and told Judge Robles that they had wanted to overbid. They didn't do that. As Mr. Rankin has pointed out, Mr. Stern did express an interest that he wanted to overbid, and the Court did give him that chance to produce the monies. It was his own failure to follow the Court's orders and to timely file or timely deposit with the trustee the $250,000. The very short time period was reached by the Court, given Mr. Stern's conduct throughout this case. He had made representations throughout that he had the money, that he had the wherewithal, and when the trustee said put up or shut up, Mr. Stern never put up. The Court gave him an additional two days to put up that money, and he never followed the Court's instructions as where to deposit. And it was only after not receiving those monies that the trustee lodged the order, which gave way to the March 7, 2003, order. Due process was met in these orders. Every creditor was served. The result out of the February 26 hearing was substantially in compliance with what was noticed. The material difference was that the estate received more. The estate received $150,000 more than they anticipated going into that hearing. And as such, the trustee would say that based on the information that he had, the standards that were articulated under AC Properties, his business judgment was met. This settlement was in the best interest of the Court. Let me be sure that I understand. Now, your position as trustee is that these orders simply approved compromises. That is correct, Your Honor. And it was compromises that were noticed. That is correct, Your Honor. And you acknowledge that there were no sales that were noticed. Right. The trustee was not going into the hearing as a sale. It was a compromise of claims. And no sale was a compromise. The trustee's position is that there was not a sale, correct? There was mutual leases exchanged for the tendering of money. So this was an event to contemplate a compromise. Compromise noticed. Compromise approved. No notice of a sale and no sale occurred. That is correct. The only difference is that Mr. Stern wanted to bid on compromise. I understand that. I understand that. But you're saying he didn't successfully do so. And if he had tendered enough money to buy anything, it might have been necessary to make some notice of a sale. It may have been. But it was wholly dependent on him taking that first step. Now, from your perspective, do I summarize it or do I oversimplify it? No, I think it's correct. You don't oversimplify it. Okay. Okay. Does anybody else over here intend to argue? Thank you. All right. Thank you. Very briefly. Thank you. I just want to make three points. First of all, at page 1052 of the transcript of the excerpts, there is a one-page declaration from the trustee, which is his full support for the compromises that the court approved in February and March of 2003. Counsel referred to the ANC properties case. It has four factors that have to be demonstrated for a court to approve a compromise. There is no evidence that was submitted to the court to support the compromises. Secondly, the Mickey Thompson Entertainment case, which is a Ninth Circuit BAP decision, 2003, says when you take a settlement and you change it into a sale, there is no going back. Counsel is incorrect that the settlement continued to be a settlement. It changed to a sale when the court permitted overbidding on the $250,000 figure. And once that occurred, there was no going back. Even if that overbidding is unsuccessful? Well, there was no opportunity for people to overbid because they weren't given notice. No, but the point is that presumably a party could defeat any settlement by saying, well, I don't have the money, but I bid a little more. That wouldn't turn this event into a sale, would it? It would not, Your Honor, but the court turned it into a sale. The court did? The court turned it into a sale. The court called it the modified settlement agreement, which had two components, one, releasing CIT, secondly, selling the claims against Stern and his affiliates. And that's what Mr. Stern got to overbid, but nobody else was given notice of it. This is which – which proceeding is this? This is the one on February 26th, 2003, where the court bifurcated the contract. The court says in its orders, I created two new contracts, but then notice of those two new contracts were never given. Okay. And the final issue that I wanted to point out, the mootness argument is a very complicated argument. We spend eight pages on it in our reply brief, and there's no way I can go through it now. But I will tell Your Honors that effective relief can be had in this case as to all parties. Monetary relief can be had, which is effective. The fact that we didn't obtain a further stay pending appeal is not dispositive, because there's no rule that the failure to get a stay pending appeal renders an appeal moot, and we cite law to that effect. There are many other arguments on the mootness issue, but these appeals are not moot. Thank you. The matter just argued is submitted for decision. That concludes the Court's counsel.
judges: Schroeder, Leavy, Sedwick